[Cite as *In re H.J.*, 2018-Ohio-206.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# ASHTABULA COUNTY, OHIO

| | | |
|---|---|---|
| IN THE MATTER OF: | : | **O P I N I O N** |
| H.J., NEGLECTED CHILD | : | |
| | | **CASE NO. 2017-A-0068** |
| | : | |

Civil Appeal from the Ashtabula County Court of Common Pleas, Juvenile Division, Case No. 2016 JC 00084.

Judgment: Affirmed.

*Nicholas A. Iarocci*, Ashtabula County Prosecutor, and *Shelley M. Pratt*, Assistant Prosecutor, Ashtabula County Courthouse, 25 West Jefferson Street, Jefferson, OH 44047, and *Margaret A. Draper*, Assistant Prosecutor, Ashtabula County Children Services Board, 3914 C Court, Ashtabula, OH 44004 (For Appellee, Ashtabula County Children Services Board).

*Judith M. Kowalksi*, 333 Babbitt Road, #323, Euclid, OH 44123 (For Appellant, Joshua Javis).

*Eileen Noon Miller*, Law Offices of Eileen Noon Miller, LLC, P.O. Box 1681, Mentor, OH 44060 (Guardian ad Litem).

DIANE V. GRENDELL, J.

{¶1}   Appellant, Joshua Javis, appeals the decision of the Ashtabula County Court of Common Pleas, Juvenile Division, granting appellee, Ashtabula County Children Services Board's, motion for permanent custody.  The issue before this court is whether a parent may be found to have abandoned his child when he has failed to visit or maintain contact with the child for over ninety days due to repeated hospitalizations

for mental illness and/or incarcerations in the county jail.  For the following reasons, we affirm the decision of the court below.

{¶2}    On April 5, 2016, when H.J. was six days old, the juvenile court granted Ashtabula County Children Services Board ex parte emergency temporary custody of the child.

{¶3}    On April 6, 2016, the Children Services Board filed a Verified Complaint for Temporary Custody on the grounds of neglect, specifically that her mother, Desiree Davis, "tested positive for marijuana at the [time of her] birth"; "all three of [H.J.'s] siblings are currently in the Temporary Custody of ACCSB"; and "Desiree is currently homeless and there are concerns of domestic violence between Desiree and Joshua Javis (alleged father)."

{¶4}    On the same day: "Mother stipulated to a finding of Probable Cause, and stipulated that paternity has not been established for the child and that the alleged father has not established any relationship with the child."

{¶5}    On May 2, 2016, H.J. was adjudicated a dependent child pursuant to R.C. 2151.04(C).

{¶6}    On June 1, 2016, a dispositional hearing was held.  The juvenile court ordered H.J. to continue in the temporary custody of the Children Services Board.  It was noted that Javis had "failed to appear and had failed to submit to paternity testing."

{¶7}    On January 10, 2017, the Children Services Board filed a Motion Requesting Modification of Temporary Custody to Permanent Custody.

{¶8}    On April 18, 2017, the Guardian ad Litem Report was filed.

{¶9}    On August 8, 2017, the permanent custody hearing was held.

2

{¶10} On August 17, 2017, the juvenile court granted the Children Services

Board's Motion for Permanent Custody. The court made the following relevant findings:

> At the time of the child's birth [March 31, 2016], Mother and Father had one other child, J., who was in the Temporary Custody of ACCSB. The child's two half-siblings were also in the Temporary Custody of the agency as of March 31, 2016.
>
> Father was present at the child's birth. Although he had been arrested two days prior to her birth, Father had been released on bond prior to the delivery. Mother was homeless at that time, and no evidence was presented that Father had a stable residence for the child.
>
> Mother, who had been required to address drug and alcohol concerns in the siblings' existing case, tested positive for marijuana when this child was born.
>
> In addition to the drug and alcohol treatment and housing issues addressed in the siblings' case plan for Mother, Mother was also required to address her mental health needs and complete a parenting class. She had not done so by March 31, 2016.
>
> Father was in and out of hospitals, and had been incarcerated multiple times during this case. Father's mental health issues included bipolar disorder and post traumatic stress disorder.
>
> He last saw the child in the Summer of 2016.
>
> While in local jail, Father testified that he was not provided any opportunities to satisfy any case plan goals. Father was sentenced in felony cases, one of which was related to the manufacturing of methamphetamine, in May 2017.
>
> Since being incarcerated in prison in May 2017, Father testified that he now has access to multiple programs. Father explained that he is now demonstrating the initiative to participate in drug treatment and 12-step meetings, parenting group, domestic violence classes, anger management, and other programming available to him. Father has received mental health services and is taking medications. With medication, Father testified that he is more stable and better able to function.

Father expressed a strong desire to be a part of his children's lives. The sibling, [J.J.], is now in the legal custody of a third party.

Father testified that it was in the best interest of the child that she should have a chance to know her parents and her siblings. Although Father expressed an appreciation for the child being cared for in the foster home, Father recounted his difficult childhood and his commitment to putting his life together. Father asked for consideration from the Court, explaining that he deserves a chance.

Father denied having any contact with Mother in the three months prior to the Permanent Custody hearing.

Father testified that his mother, the child's Paternal Grandmother, Patricia Pulsifer, is a potential placement for the child. Paternal Grandmother, Patricia Pulsifer, is/was known to the agency, and was determined not to be an appropriate placement for the child. Paternal Grandmother was convicted of a felony for taking drugs to Father while he was incarcerated. Father has no other family except for a brother who was unable to care for this child.

Sadie Duris, the ACCSB caseworker, worked with the family since November 2016 when the case was transferred from the prior caseworker, Dorothy Russell. Father acknowledged contact with Ms. Duris on one occasion when he was in the county jail.

Ms. Duris testified that Mother failed to address her drug abuse and mental health needs, failed to obtain stable housing and income, and failed to complete a parenting class. Mother did not complete any case plan requirements. The caseworker last saw Mother in person on February 8, 2017.

Mother completed a mental health assessment on September 24, 2015. The caseworker testified that Mother, however, failed to comply with recommendations.

Mother made multiple attempts at drug treatment. After failed attempts at treatment, Mother completed a residential Turning Point program on June 29, 2016. It was recommended that she complete additional outpatient treatment upon her release, but she failed to comply with the recommendation when she attended only ten sessions of an Intensive Outpatient Program. The caseworker testified that Mother failed to help herself by

4

addressing her substance abuse issue as required by the case plan.

Mother did not complete a parenting class.

Mother does not have stable income or housing. Mother's whereabouts are unknown. On May 9, 2017, Mother refused to provide the caseworker with a current address but did inform her caseworker that Mother no longer lived at her parents' home.

The caseworker had additional contact with Mother on August 3, 2017 by messaging Mother on Facebook. Mother did not wish to meet with the caseworker, and informed the caseworker that Mother did not intend to appear at the Permanent Custody hearing.

The child is doing well in the foster home where she resides with a foster mother. The child plays and interacts with two other foster children and the foster mother's biological daughter, all of whom reside in the home. There are no concerns with the home or the care provided to the child in her foster home.

The child has biological siblings and she was provided visits with her sibling [J.J.] until he was placed in legal custody of the third party. The child no longer visits with her sibling [J.J.] or other siblings.

Although the caseworker remained willing to work with Father, Father remained incarcerated throughout this case with continued incarceration through his anticipated release date of April 9, 2019. Father believes he will be able to earn an early release, and has informed himself of programs that will assist him in attaining stability within 90 days of his release.

Father understands that he made poor choices that led to his incarceration.

Ms. Duris and the Guardian ad litem testified that the children [sic] need legally secure permanent placement only possible with the grant of permanent custody, and that the foster mother expressed a commitment to adopt the child.

{¶11} On September 19, 2017, Javis filed a notice of appeal. On appeal, he raises the following assignments of error:

5

{¶12} "[1.] The decision to award permanent custody was against the manifest weight of the evidence."

{¶13} "[2.] The juvenile court erred to the prejudice of the appellant by finding that the father had abandoned the child."

{¶14} Upon the motion of a public children services agency requesting permanent custody of a child pursuant to R.C. 2151.413, the juvenile court may grant the motion "if the court determines at the hearing held pursuant to [R.C. 2151.414(A)], by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and * * * [t]he child is abandoned." R.C. 2151.414(B)(1)(b); *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 8-22.

> (1) In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D).

{¶15} The Ohio Supreme Court "has defined clear and convincing evidence as 'that measure or degree of proof which is more than a mere "preponderance of the

6

evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶16} When reviewing the weight of the evidence, the reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Citation omitted.) *Eastley v. Volkman,* 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

{¶17} For clarity, we shall address the second assignment of error first.

{¶18} Javis claims the juvenile court erred by finding that he had abandoned the child.

{¶19} "For the purposes of this chapter [R.C. Chapter 2151], a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C).

{¶20} In the present case, it is undisputed that Javis has not seen or otherwise had any contact with H.J. since the summer of 2016 (about six months prior to the filing of the motion for permanent custody). Javis asserts that his "inability to communicate or

visit with her was beyond his control" inasmuch as he "was incarcerated [and] also underwent hospitalization for mental illness during this time period." Appellant's brief at 12.

{¶21} The record before this court supports the finding of abandonment. Beyond failing to maintain contact with H.J., Javis has contributed nothing to her support. Javis has not attended a single hearing (except the permanent custody hearing) or case review relating to H.J. Javis was dilatory in establishing paternity of H.J. Despite being ordered to submit to a paternity test in April 2016, Javis did not formally establish paternity until 2017. Javis did not request visitation with H.J.

{¶22} Javis was in contact with H.J.'s mother during this time, and she would "let [him] know how the visits were going with the kids" before they eventually "just stopped talking" (about three months before the permanent custody hearing). Javis was at least aware of who the caseworker and the guardian ad litem for H.J. were, but made no effort to be involved with H.J. through them.[1] Javis testified that he was "placed in North Coast Behavioral Hospital a couple of times" and had "been in and out of the County Jail for bond revocations and re-bonding and back and forth." Javis' legal and mental health issues do not negate his failure to make any positive effort to care for or otherwise be involved in H.J.'s life. *In re Bailey Children*, 5th Dist. Stark No. 2004 CA 00386, 2005-Ohio-2981, ¶ 32 ("[a]lthough appellant was aware that the children had been removed from their mother's care and had been possibly placed in foster care, he

---

[1]. The guardian testified: "I haven't seen Mr. Javis since the birth of [H.J.]. I saw him briefly with one of his other children, [J.J.], the one that was taken into temporary custody. He appeared at the Court and rapidly left before the hearing, and I haven't seen him since then." The caseworker testified: "I met with [Javis] once kind of accidental in the County Jail and talked with him there."

8

admitted to making no attempt to contact SCDJFS or the mother to determine their status").

**{¶23}** The case of *In re C.S.*, 9th Dist. Summit No. 25344, 2010-Ohio-4463, relied upon by Javis, is wholly distinguishable inasmuch as the mother was not found to have abandoned her child but, rather, "was not permitted to have any visitation or other contact with her daughter for nearly eighteen months during this case." *Id.* at ¶ 9. Javis cannot claim to have been denied visitation if he never sought visitation in the first place.

**{¶24}** The second assignment of error is without merit.

**{¶25}** In the first assignment of error, Javis argues in general that the decision to terminate his parental rights was against the weight of the evidence. He notes that "the State presented very little evidence in support of its motion for permanent custody." Appellant's brief at 9.

**{¶26}** The dearth of evidentiary material in the present case reflects Javis' own failure to establish any relationship with the minor child. There was sufficient evidence, particularly in regard to H.J.'s need for a legally secure permanent placement, for the juvenile court to have made a valid determination of H.J.'s best interests. The court determined "by clear and convincing evidence that the best interests of the child are served by granting permanent custody to ACCSB." The evidence duly supports this determination.

**{¶27}** The first assignment of error is without merit.

{¶28} For the foregoing reasons, the judgment of the Ashtabula County Court of Common Pleas, Juvenile Division, granting permanent custody of H.J. to the Ashtabula County Children Services Board is affirmed. Costs to be taxed against the appellant.


THOMAS R. WRIGHT, P.J.,

CYNTHIA WESTCOTT RICE, J.,

concur.