[Cite as *In re A.H.*, 2014-Ohio-552.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

IN RE: A.H.

C.A. No.     13CA010454

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.     09JC26622

DECISION AND JOURNAL ENTRY

Dated: February 18, 2014

CARR, Presiding Judge.

{¶1}    Appellant, Father, who has the same initials as his son, appeals from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated his parental rights and placed his minor son in the permanent custody of Lorain County Children Services ("LCCS").  This Court affirms.

I.

{¶2}    Father is the natural father of A.H., born November 23, 2000.  The mother of A.H. voluntarily relinquished her parental rights and is not a party to this appeal.

{¶3}    Although the custodial history of A.H., now 13 years old, is not clear from the record, he has spent most of life living in temporary homes.  He lived with Father for most of the first year of his life.  For the next several years, he lived with a paternal aunt who was appointed his legal guardian because Father was incarcerated for seven years and his mother was apparently unable or unwilling to care for him.  After A.H. had lived with his aunt for several

years, however, she began transitioning him to his mother's custody although no legal documents to that effect were executed.

{¶4} When LCCS first filed this involuntary dependency case in June 2009, A.H. was eight years old. In addition to allegations of physical abuse of A.H. by his mother's boyfriend, it was not disputed that A.H. had serious mental health and behavioral problems. The alleged physical abuse by his mother's boyfriend had only exacerbated his mental health and behavioral problems. A.H. repeatedly expressed suicidal and homicidal thoughts and acted out in aggressive and harmful ways toward himself and others. He was adjudicated a dependent child on August 5, 2009.

{¶5} For the next three years, A.H. lived in a variety of different settings because his caregivers were unable to stabilize his mental health and control his harmful behavior. After being removed from his mother's home, A.H. lived for periods of time in homes with Father, an aunt, two therapeutic foster families, and in different mental health institutions. He also spent several months in juvenile detention because his violent outbursts had resulted in domestic violence charges in March 2012, after he attacked his foster mother and again near the end of 2012, after he threatened his cousin with a knife and allegedly committed other violent acts in the aunt's home including breaking the dog's leg.

{¶6} The primary focus of the case plan was to stabilize A.H.'s mental health and behavioral problems. A.H. was diagnosed with attention deficit hyperactivity disorder, posttraumatic stress disorder, and conduct disorder. Although treatment professionals had prescribed medication and A.H. continued to participate in counseling, his behavior did not improve. Through the advice of his treatment professionals, LCCS ultimately concluded that A.H. was in need of a highly structured environment, without other children in the home, and a

caregiver who had been trained to deal with his specific mental health and behavioral issues and could give him considerable one-on-one attention. None of A.H.'s relatives had demonstrated that they were willing and able to provide A.H. with such a structured environment, however.

{¶7} On January 18, 2013, LCCS moved for permanent custody of A.H. Following a hearing on the motion, the trial court found that A.H. had been in the temporary custody of LCCS for more than 12 of the prior 22 months and that permanent custody was in his best interest. Consequently, it terminated Father's parental rights and placed A.H. in the permanent custody of LCCS. Father appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

> THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN VIOLATION OF [FATHER'S] [RIGHTS UNDER THE] FOURTEENTH AMENDMENT TO THE UNITED STATE[S] CONSTITUTION DUE PROCESS CLAUSE AND ARTICLE I SECTION SIXTEEN OF THE OHIO CONSTITUTION IN FINDING THAT PERMANENT CUSTODY WAS SUPPORTED BY CLEAR AND CONVINCING EVIDENCE, AND IN TERMINATING APPELLANT'S PARENTAL RIGHTS WHEN THE TRIAL COURT'S JUDGMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶8} Father's sole assignment of error is that the trial court's permanent custody decision was not supported by the evidence presented at the hearing. Before a juvenile court may terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test that: (1) the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of

the child, based on an analysis under R.C. 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶9} The trial court found that the first prong of the permanent custody test had been satisfied for two alternate reasons: A.H. had been in the temporary custody of LCCS for more than 12 of the prior 22 months, and he could not or should not be returned to either parent's custody. R.C. 2151.414(B)(1)(d); R.C. 2151.414(E). Although Father disputes the trial court's finding under R.C. 2151.414(E), he does not dispute that its finding under the "12 of 22" provision of R.C. 2151.414(B)(1)(d) was supported by the record. Because the "12 of 22" finding was sufficient to support the first prong of the permanent custody test, any error in the trial court's alternate finding under R.C. 2151.414(E) would not constitute reversible error because it did not result in any prejudice to Father. *In re R.H.*, 9th Dist. Lorain Nos. 11CA010002 and 11CA010003, 2011-Ohio-6749, ¶ 14.

{¶10} Next, Father argues that the trial court's best interest determination was not supported by the evidence presented at the hearing. When determining whether a grant of permanent custody is in the children's best interests, the juvenile court must consider the following factors:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency * * *.

R.C. 2151.414(D)(1)(a)-(d).[1]

{¶11} Although this Court has held that the trial court must make an explicit best interest finding after considering the mandatory factors set forth in R.C. 2151.414(D), it has only noted in dicta that the trial court "should" also detail its findings on each best interest factor, as such reasoning would aid this Court's ability to conduct a meaningful appellate review. *See, e.g.*, *In re M.B.,* 9th Dist. Summit No. 21760, 2004–Ohio–597. The trial court explicitly found that "it is in the child's best interests to permanently terminate parental rights and grant permanent custody to [LCCS]." It further indicated that, in making that finding, it had considered "all relevant factors, including, but not limited to, those factors enumerated in R.C. 2151.414(D)[.]"

{¶12} Moreover, the record supports the trial court's conclusion that permanent custody was in the best interest of A.H. The first best interest factor required the trial court to consider the interaction and interrelationship between A.H. and Father. The caseworker testified that Father had failed to regularly visit A.H. during the two years after he was removed from Father's home. For example, during the five months that A.H. was placed in the first mental health facility, Father visited him only one or two times. While A.H. was in a detention facility for more than four months, Father visited him only once. At the mental health facility where A.H. had most recently been residing for the five months prior to the hearing, Father visited A.H. only twice. A.H.'s therapist testified that A.H. became upset and anxious when Father did not come to the most recent visit he had scheduled there, at which he had promised to bring A.H. certain clothes that he had left at Father's home.

---

[1] The factor set forth in R.C. 2151.414(D)(1)(e) does not apply to the facts of this case.

{¶13} Through his own testimony, Father conceded that, throughout the two years that A.H. had been in the temporary custody of LCCS, he had visited him only sporadically. Although Father attempted to justify some of his lack of visitation by stating that he was not permitted to visit A.H. at certain institutions, other witnesses contradicted that testimony. Father offered no explanation for why he had missed the last visit that he had scheduled with A.H.

{¶14} A.H. had expressed no desire to return to the home of Father. Although he wanted to return to the home of his aunt, A.H. had threatened one of his young cousins who lived there and was prohibited by a court order from having unsupervised contact with that child. Moreover, after that violent incident, the aunt no longer expressed a willingness to provide a home for A.H. The guardian ad litem expressed her opinion that permanent custody was in the best interest of A.H., explaining that the aunt was no longer willing to provide a home for A.H. and Father had never played a primary role in the life of A.H.

{¶15} As explained already, the custodial history of A.H. is not clear from the record except that he had spent most of his life moving in and out of relative, non-relative, and institutional homes because no caregiver had been able to stabilize his mental health or control his serious behavioral problems. At the time of the hearing, A.H. had been living in a mental health treatment facility for five months. His individual therapist described A.H. as being "pretty unmanageable" when he arrived at the facility. She explained that he was "hyper-aroused all the time" and sometimes had to be put in physical restraints because he posed a risk of physically harming himself or others.

{¶16} The therapist opined that A.H. had "definitely progressed" during the five months he had been at the facility, where every moment of his day was highly structured. A.H. continued to interact better in one-on-one situations than in group settings because he became

overwhelmed with many other children in the room and tended to act out. Although A.H. had made significant progress there, she did not know when he would be stable enough to be released from the facility. The therapist further explained that it was essential for A.H. to have a caregiver who fully understood his diagnoses and had been adequately trained in how to appropriately deal with his special needs.

{¶17} Because A.H. had spent most of his life living in temporary homes, he was in need of a legally secure permanent placement. Although Father argues that he was "willing and able to take custody" of A.H., the evidence before the trial court demonstrated otherwise. Father had not visited A.H. often enough to maintain a relationship with him, nor had he made an effort to understand his special needs.

{¶18} Father conceded that he and his wife had been unable to handle A.H.'s aggressive behavior when he lived in their home and that, while he lived with Father, A.H. had been hospitalized repeatedly for self-harming behaviors and thoughts. Although A.H. had been in counseling and his medications had been adjusted several times, Father testified that nothing seemed to help control A.H.'s behavior and he only became more aggressive over time. When A.H. was removed from Father's home, he was not taking his psychiatric medication and had assaulted Father's then-pregnant wife by punching her in the abdomen, stating that he did not want a little brother or sister, and had threatened to stab Father in his sleep.

{¶19} According to the caseworker, Father had made minimal progress on the reunification goals of the case plan. During the eight months that the current caseworker had been assigned to this case, Father had never attended a family team meeting even though the caseworker mailed him advance notice of each meeting. At the time of the hearing, the caseworker had not spoken to Father for a few months because he had made no attempts to

contact her and had not provided her with his updated contact information. The caseworker expressed particular concern that Father had made little effort to understand A.H.'s mental health diagnoses and had no plan in place to address the special needs of A.H. if he were returned to Father's custody. Father admitted that he had never spoken to A.H.'s current therapist about any of the child's problems or the techniques that the therapist had found to be effective in controlling A.H.'s destructive and harmful misbehavior.

{¶20} Father's testimony at the hearing further demonstrated that he lacked an understanding of his son's significant mental health and behavioral problems or the extent to which those problems were affected by his home environment. When Father was initially asked what had changed during the past two years that would enable him to provide A.H. with a suitable home, Father could not point to anything. He simply stated that he and his wife had grown to "accept the fact that we have to deal with [A.H.], regardless of what [his] behaviors [are.] He's our kid." Father also testified that he had reduced his long work hours, explaining that if he were not so tired, he would have more energy to deal with A.H.

{¶21} When asked a similar question later in the hearing, Father responded that "[A.H. has changed." His later statement that A.H. had learned to control his behavior only demonstrated his misunderstanding that the progress A.H. had made in his current treatment setting would automatically transfer to another environment. Father explained that A.H. could be "stubborn," implying his belief that A.H. unnecessarily demanded attention when he should be more self-sufficient. He further testified that he had tried to explain to A.H. that his younger sibling and step-sibling needed more attention because they were several years younger.

{¶22} Moreover, although Father testified that he planned to look for another home, at the time of the hearing, he was living in a four-bedroom house with his wife, child, and step-

child, as well as his sister, her husband, and their four children.  Father explained that, if A.H. were to come live in that home, he would share a bedroom with Father, his wife, and their two children.  A.H.'s therapist expressed concern about A.H. returning to that type of environment.  She believed that A.H. would be overwhelmed by so many people in the home and that the environment could impede the ongoing progress that he had made during the past five months.

{¶23}  Consequently, the trial court reasonably concluded that Father was not prepared to provide A.H. with a stable permanent home.  Because there were no other relatives who were willing and able to do so, the court concluded that A.H. would achieve a legally secure permanent placement only if it terminated Father's parental rights and A.H. was placed for adoption.  Because there was substantial evidence before the trial court to support its best interest determination, Father's assignment of error is overruled.

III.

{¶24}  Father's assignment of error is overruled.  The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution.  A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the

period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

WHITMORE, J.
MOORE, J.
CONCUR.

APPEARANCES:

ROBERT CABRERA, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and ERIN K. MEYER, Assistant Prosecuting Attorney, for Appellee.