[Cite as *In re L.L.*, 2020-Ohio-1565.]

IN THE COURT OF APPEALS OF OHIO
THIRD APPELLATE DISTRICT
HANCOCK COUNTY

IN RE:

L.L.,

    CASE NO. 5-19-33

ALLEGED ABUSED, NEGLECTED
AND DEPENDENT CHILD.

    O P I N I O N

[BRANDY JOHNSON - APPELLANT]

Appeal from Hancock County Common Pleas Court
Juvenile Division
Trial Court No. 20183001

**Judgment Affirmed**

Date of Decision: April 20, 2020

APPEARANCES:

    *Alison Boggs* **for Appellant**

    *Wesley R. True* **for Appellee**

Case No. 5-19-33

**PRESTON, J.**

{¶1} Appellant, Brandy Johnson ("Johnson"), appeals the August 26, 2019 judgment of the Hancock County Court of Common Pleas, Juvenile Division granting permanent custody of Johnson's daughter, L.L., to the Hancock County Department of Job and Family Services Children's Protective Services Unit ("CPSU"). For the reasons that follow, we affirm.

{¶2} Johnson and Zachary Lanning ("Lanning") are the biological parents of L.L. When L.L. was born on January 27, 2018, she tested positive for opiates and cocaine. (Doc. No. 1). On January 30, 2018, CPSU filed a complaint alleging that L.L. was an abused, neglected, and dependent child. (*Id.*). That same day, CPSU filed a motion requesting that the trial court grant emergency temporary custody of L.L. to CPSU. (*Id.*). Following a hearing on February 1, 2018, the trial court granted CPSU's motion, and L.L. was placed in the emergency temporary custody of CPSU. (Doc. No. 11). On February 13, 2018, the trial court appointed a guardian ad litem ("GAL") for L.L.[1] (Doc. No. 13).

{¶3} At a hearing on March 15, 2018, L.L. was adjudicated abused, neglected, and dependent. (Doc. No. 17). Following a dispositional hearing on April 12, 2018, the trial court determined that L.L. would remain in the temporary custody of CPSU. (Doc. No. 20).

---

[1] The trial court later permitted this GAL to withdraw from the case. (Doc. No. 53). On November 14, 2018, the trial court appointed a new GAL for L.L. (*Id.*).

{¶4} On May 8, 2018, CPSU filed a motion for contempt. (Doc. No. 22). In its motion, CPSU asked the trial court to hold Johnson in contempt because Johnson failed to appear for nine random drug screens. (*Id.*).

{¶5} Beginning in May 2018, Johnson was repeatedly hospitalized for a number of health issues, including endocarditis. (Aug. 16, 2019 Tr. at 116). In July 2018, Johnson was required to undergo open-heart surgery. (*Id.* at 56, 131). Following her surgery, Johnson was admitted into a nursing home, where she remained until September 2018. (*Id.* at 39, 133-134). Johnson attributed her health problems to her previous use of intravenous drugs. (*Id.* at 104, 117).

{¶6} Due in part to Johnson's hospitalizations, a hearing on CPSU's motion for contempt was not held until October 4, 2018, at which time the trial court found Johnson to be in contempt of court. (Doc. No. 50). On November 20, 2018, Johnson, having failed to purge the contempt, was committed to the Hancock County Justice Center for 30 days. (Doc. No. 58). In addition, in late November 2018, Johnson began serving a 180-day jail sentence in the Hancock County Justice Center for a theft charge from 2017. (Aug. 16, 2019 Tr. at 43-44, 80, 134). Johnson was released from jail in late May 2019. (*Id.* at 117).

{¶7} On February 1, 2019, CPSU filed a motion for permanent custody of L.L. (Doc. No. 64). The GAL filed her report on June 21, 2019. (Doc. No. 84). A permanent custody hearing was held on August 16, 2019. (Aug. 16, 2019 Tr. at 1);

(Doc. No. 89). On August 26, 2019, the trial court granted CPSU's motion for permanent custody and awarded permanent custody of L.L. to CPSU. (Doc. No. 89).

{¶8} On September 18, 2019, Johnson filed a notice of appeal.[2] (Doc. No. 95). She raises three assignments of error for our review. Because her assignments of error concern related issues, we will address them together.

### Assignment of Error No. I

**The trial court's decision granting permanent custody was against the manifest weight of the evidence and amounted to an abuse of discretion.**

### Assignment of Error No. II

**The agency failed to use reasonable efforts to reunify Miss Johnson with her daughter.**

### Assignment of Error No. III

**The agency did not prove by clear and convincing evidence that Miss Johnson abandoned her child, as contemplated by the statute.**

{¶9} In her assignments of error, Johnson argues that the trial court erred by awarding permanent custody of L.L. to CPSU. Specifically, in her first assignment of error, Johnson argues that clear and convincing evidence does not support either the trial court's determination that one or more of the R.C. 2151.414(B)(1)(a)-(e)

---

[2] Lanning is not a party to this appeal. Prior to the permanent custody hearing, Lanning consented to the grant of permanent custody to CPSU. (*See* Doc. No. 76).

factors apply or its determination that granting permanent custody of L.L. to CPSU is in L.L.'s best interest. (Appellant's Brief at 8-16). In her second assignment of error, Johnson argues that the trial court erred by concluding that CPSU used reasonable efforts to reunify her with L.L. (*Id.* at 16-19). In particular, Johnson argues that the record does not support that CPSU "had reasonable case planning and used any effort, let alone diligent effort, to help [her] with the completion of the case plan." (*Id.* at 17). *See* R.C. 2151.414(E)(1). Finally, in her third assignment of error, Johnson argues that the trial court erred by concluding that L.L. is an abandoned child. (Appellant's Brief at 19-24). She contends that she rebutted any presumption of abandonment by showing that the "time frames relied upon by the court to justify finding she abandoned [L.L.] were the times she was hospitalized for major open-heart surgery and while she was in jail." (*Id.* at 20).

{¶10} The right to raise one's child is a basic and essential right. *In re Murray*, 52 Ohio St.3d 155, 157 (1990), citing *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208 (1972) and *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625 (1923). "Parents have a 'fundamental liberty interest' in the care, custody, and management of the child." *Id.*, quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388 (1982). However, the rights and interests of a natural parent are not absolute. *In re Thomas*, 3d Dist. Hancock No. 5-03-08, 2003-Ohio-5885, ¶ 7. These rights may be terminated under appropriate circumstances and when the trial court

has met all due process requirements. *In re Leveck*, 3d Dist. Hancock Nos. 5-02-52, 5-02-53 and 5-02-54, 2003-Ohio-1269, ¶ 6.

{¶11} "R.C. 2151.414 outlines the procedures that protect the interests of parents and children in a permanent custody proceeding." *In re N.R.S.*, 3d Dist. Crawford Nos. 3-17-07, 3-17-08 and 3-17-09, 2018-Ohio-125, ¶ 12, citing *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, ¶ 26. "When considering a motion for permanent custody of a child, the trial court must comply with the statutory requirements set forth in R.C. 2151.414." *In re A.M.*, 3d Dist. Marion No. 9-14-46, 2015-Ohio-2740, ¶ 13, citing *In re C.E.*, 3d Dist. Hancock Nos. 5-09-02 and 5-09-03, 2009-Ohio-6027, ¶ 14. "R.C. 2151.414(B)(1) establishes a two-part test for courts to apply when determining whether to grant a motion for permanent custody: (1) the trial court must find that one of the circumstances in R.C. 2151.414(B)(1)(a)-(e) applies, and (2) the trial court must find that permanent custody is in the best interest of the child." *In re Y.W.*, 3d Dist. Allen No. 1-16-60, 2017-Ohio-4218, ¶ 10, citing *In re S.G.*, 9th Dist. Wayne No. 15AP0005, 2015-Ohio-2306, ¶ 10 and *In re Brown*, 98 Ohio App.3d 337, 343 (3d Dist.1994). R.C. 2151.414(B)(1) provides, in relevant part, that a trial court

> may grant permanent custody of a child to a movant if the court
>
> determines at the hearing held pursuant to [R.C. 2151.414(A)], by
>
> clear and convincing evidence, that it is in the best interest of the child

to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

R.C. 2151.414(B)(1)(a)-(b). "Specifically concerning R.C. 2151.414(B)(1)(a), '[i]f one or more of the factors enumerated in R.C. 2151.414(E) is found to be present by clear and convincing evidence, the trial court shall find that the child cannot be placed with the parents within a reasonable period of time or should not be placed with the parents.'" *In re A.M.* at ¶ 13, quoting *In re A.F.*, 3d Dist. Marion No. 9-11-27, 2012-Ohio-1137, ¶ 54, citing *In re Goodwin*, 3d Dist. Shelby No. 17-08-12, 2008-Ohio-5399, ¶ 23.

{¶12} As relevant to the resolution of this case, R.C. 2151.414(E) provides:

In determining at a hearing held pursuant to [R.C. 2151.414(A)] * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the

court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to [R.C. 2151.414(A)] * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

R.C. 2151.414(E)(1).[3]

---

[3] In this case, although the trial court also made findings under R.C. 2151.414(E)(2), (4), (10), and (11), the trial court's findings under those divisions are only minimally relevant to our determination of Johnson's

{**¶13**} "'If the trial court determines that any provision enumerated in R.C. 2151.414(B)(1) applies,' it must proceed to the second prong of the test, which requires the trial court to 'determine, by clear and convincing evidence, whether granting the agency permanent custody of the child is in the child's best interest.'" *In re K.M.S.*, 3d Dist. Marion Nos. 9-15-37, 9-15-38 and 9-15-39, 2017-Ohio-142, ¶ 23, quoting *In re A.F.* at ¶ 55 and citing R.C. 2151.414(B)(1). "The best interest determination is based on an analysis of R.C. 2151.414(D)." *Id.*

{**¶14**} "Under R.C. 2151.414(D)(1), the trial court is required to consider all relevant factors listed in that subdivision, as well as any other relevant factors." *Id.* at ¶ 24, citing *In re H.M.*, 3d Dist. Logan Nos. 8-13-11, 8-13-12 and 8-13-13, 2014-Ohio-755, ¶ 27. The R.C. 2151.414(D)(1) factors include:

(a)    The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b)    The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

---

assignments of error.  (Doc. No. 89).  Thus, for the sake of brevity, we will not reproduce those divisions here.

(c)   The custodial history of the child, including whether the child

has been in the temporary custody of one or more public children

services agencies or private child placing agencies for twelve or more

months of a consecutive twenty-two-month period * * *;

(d)   The child's need for a legally secure permanent placement and

whether that type of placement can be achieved without a grant of

permanent custody to the agency;

(e)   Whether any of the factors in divisions (E)(7) to (11) of this

section apply in relation to the parents and child.

R.C. 2151.414(D)(1).  "Under this test, the trial court considers the totality of the circumstances when making its best interest determinations.  No single factor is given more weight than others."  *In re N.R.S*, 2018-Ohio-125, at ¶ 16, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, ¶ 56.

{¶15} If the trial court makes these statutorily required determinations, a reviewing court will not reverse a trial court's decision unless it is not supported by clear and convincing evidence.  *In re H.M.K.*, 3d Dist. Wyandot Nos. 16-12-15 and 16-12-16, 2013-Ohio-4317, ¶ 43, citing *In re Meyer*, 98 Ohio App.3d 189, 195 (3d Dist.1994), citing *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985) and *In re Adoption of Lay*, 25 Ohio St.3d 41, 42 (1986).  "Clear and convincing evidence is that which is sufficient to produce in the mind of the trier of fact a firm belief or

conviction as to the facts sought to be established." *In re S.G.*, 2015-Ohio-2306, at ¶ 10, citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶16} For ease of discussion, we will consider Johnson's assignments of error out of order, beginning with her third assignment of error. In her third assignment of error, Johnson argues that clear and convincing evidence does not support the trial court's determination under R.C. 2151.414(B)(1)(b) that L.L. is abandoned. "For the purposes of [R.C. Chapter 2151], a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C). Numerous courts, including this one, have determined that R.C. 2151.011(C) creates a presumption of abandonment, which may be rebutted by the parents. *E.g.*, *In re L.M.*, 6th Dist. Lucas No. L-16-1212, 2017-Ohio-610, ¶ 28, citing *In re S.B.*, 183 Ohio App.3d 300, 2009-Ohio-3619, ¶ 33 (10th Dist.); *In re M.J.*, 2d Dist. Greene Nos. 2014-CA-32 and 2014-CA-33, 2015-Ohio-127, ¶ 33; *In re D.K.*, 3d Dist. Allen No. 1-09-16, 2009-Ohio-5438, ¶ 25, citing *In re Cravens*, 3d Dist. Defiance No. 4-03-48, 2004-Ohio-2356, ¶ 23.

{¶17} With respect to whether Johnson abandoned L.L., the trial court found:

[Johnson] has, on two occasions, met the abandonment standard outlined in R.C. §2151.011(C). [Johnson] failed to visit with [L.L.] in April, May, June, July, and August 2018. Likewise she failed to visit with [L.L.] in October, November, [and] December 2018 and [in] January, February, March, April and May of 2019. Much argument was made by [Johnson's] counsel that she was unable to visit due to medical issues and being in jail. Even if the Court were [to] accept this argument, there were many months when she was not ill and not in jail and still failed to visit the child. [Johnson] testified that her illness was a result of drug use. When she was released from the hospital, she did not immediately go to reinitiate visits, she instead began again using drugs. Furthermore, her jail time was imposed as a result of wrongdoing on her part. * * * When her sentence was completed, she, again, did not reinitiate visits. She instead used cocaine and eventually entered residential treatment after it was suggested by her adult probation officer. The Court finds by clear and convincing evidence that [L.L.] is abandoned * * *.

(Doc. No. 89).

{¶18} After reviewing the record, we conclude that clear and convincing evidence supports the trial court's determination that L.L. is abandoned. The record

reflects that from February 2018, when L.L. was removed from Johnson's custody, until late May 2019, when Johnson was released from jail, Johnson had a total of three visits with L.L.—in February, March, and September 2018. (Aug. 16, 2019 Tr. at 16-17, 58, 118-119, 132). Thus, the record supports the trial court's finding that Johnson failed to visit with L.L. between April 2018 and August 2018 and between October 2018 and May 2019. Furthermore, while the record supports that Johnson had inconsistent communications with CPSU caseworkers during her hospitalizations and nursing home stay, it does not contain any evidence suggesting that Johnson otherwise attempted to maintain contact with L.L. (*See id.* at 132). Therefore, CPSU presented ample evidence demonstrating that Johnson twice went more than 90 days without visiting or maintaining contact with L.L., thus raising R.C. 2151.011(C)'s presumption of abandonment.

{¶19} Though Johnson appears to acknowledge that CPSU produced enough evidence to raise the presumption of abandonment, she argues that she rebutted the presumption of abandonment because evidence was presented establishing that the gaps in visitation and contact were attributable to her poor health, hospitalizations, and incarceration—none of which, according to Johnson, demonstrates that she intended to abandon L.L. (Appellant's Brief at 20-24). In addition, concerning the gap in visitation Johnson imputes to her poor health and hospitalizations, she contends that her "actions of reaching out to the agency when she was able * * *

-13-

indicat[es] that her absence from L.L.'s life was not because she desired to sever ties with her daughter." (*Id.* at 22).

{¶20} Johnson's arguments are without merit. Even assuming that Johnson's limited contacts with CPSU caseworkers during her hospitalizations and nursing home stay are sufficient to rebut the presumption of abandonment created by her failure to visit or maintain contact with L.L. from April 2018 through August 2018, insufficient evidence was presented to rebut the presumption of abandonment raised by Johnson's failure to visit or maintain contact with L.L. from October 2018 through May 2019. First, the record reflects that Johnson's failure to visit or contact L.L. during this period was not caused entirely by her incarceration. During the approximately two-month period between September 2018, when she was discharged from the nursing home, and late November 2018, when she was incarcerated, Johnson was completely free to visit or contact L.L. and healthy enough to do so. Yet, rather than attempting visitation or contact with L.L., Johnson testified that after visiting with L.L. in September 2018, she resumed some of her old habits. (Aug. 16, 2019 Tr. at 132-134). Thus, Johnson's incarceration cannot account for her failure to visit or contact L.L. for the entirety of October 2018 and most of November 2018. Furthermore, the record does not contain any evidence that Johnson requested visitation with L.L. during her incarceration or that she otherwise tried to maintain contact, and by itself, Johnson's incarceration, the

consequence of her own voluntary actions, does not excuse her failure to visit or maintain contact with L.L. from October 2018 through May 2019. *In re H.J.*, 11th Dist. Ashtabula No. 2017-A-0068, 2018-Ohio-206, ¶ 22, citing *In re Bailey Children*, 5th Dist. Stark No. 2004 CA 00386, 2005-Ohio-2981, ¶ 32; *In re L.M.*, 2017-Ohio-610, at ¶ 29-31; *In re C.B.*, 4th Dist. Highland No. 16CA22, 2016-Ohio-8293, ¶ 21-24; *In re W.H.*, 5th Dist. Stark No. 2015CA00131, 2015-Ohio-4360, ¶ 14, citing *In re Wright*, 5th Dist. Stark No. 2003CA00347, 2004-Ohio-1094, ¶ 15-19; *In re M.J.*, 2015-Ohio-127, at ¶ 36-42. Finally, although the record reflects that Johnson restarted visitations with L.L. following her release from jail, the presumption of abandonment "is not rebutted by evidence that the parents resumed contact with the child after [the 90-day period] had expired." *In re C.B.* at ¶ 23, citing *In re S.B.*, 183 Ohio App.3d 300, 2009-Ohio-3619, at ¶ 33-35, citing *In re Wright* at ¶ 19-20; R.C. 2151.011(C). Accordingly, we conclude that clear and convincing evidence supports the trial court's determination pursuant to R.C. 2151.414(B)(1)(b) that L.L. is abandoned.

{¶21} Next, we consider Johnson's second assignment of error, in which she argues that CPSU failed to prove that it used reasonable efforts to reunify her with L.L. At the outset, we note that while Johnson repeatedly uses the phrase "reasonable efforts" throughout her second assignment of error, she continually cites to R.C. 2151.414(E)(1), which does not use the phrase "reasonable efforts."

(*See* Appellant's Brief at 16-19).  Instead, when applicable, R.C. 2151.414(E)(1) directs the trial court to consider whether a children services agency has offered "reasonable case planning and diligent efforts * * * to assist the parents to remedy the problems that initially caused the child to be placed outside the home * * *."  In this case, the trial court used R.C. 2151.414(E)(1) as a basis for its determination under R.C. 2151.414(B)(1)(a) that L.L. cannot be placed with Johnson within a reasonable time or should not be placed with Johnson.[4]  (Doc. No. 89).

{¶22} However, in light of our resolution of Johnson's third assignment of error, we need not consider whether the trial court's R.C. 2151.414(E)(1) findings are supported by the record.  "The factors contained within R.C. 2151.414(B)(1)(a)-(e) are alternative findings, and only one must be met in order for the first prong of the permanent custody test to be satisfied."  *In re S.G.*, 2015-Ohio-2306, at ¶ 11, citing *In re M.M.*, 9th Dist. Lorain Nos. 10CA009744, 10CA009745, 10CA009746 and 10CA009747, 2010-Ohio-2278, ¶ 12.  Here, the trial court made determinations under both R.C. 2151.414(B)(1)(a) and 2151.414(B)(1)(b), and as discussed above, the trial court's determination under R.C. 2151.414(B)(1)(b) that L.L. is abandoned is supported by clear and convincing evidence.  Therefore, because the trial court's determination under R.C. 2151.414(B)(1)(b) supplies an independently sufficient basis for granting CPSU's motion for permanent custody, it is immaterial whether

---

[4] As indicated above, the trial court also made findings under R.C. 2151.414(E)(2), (4), (10), and (11) to support its determination under R.C. 2151.414(B)(1)(a).  (Doc. No. 89).

the trial court's R.C. 2151.414(E)(1) findings, which support its R.C. 2151.414(B)(1)(a) determination, are supported by the record. *See In re A.H.*, 9th Dist. Lorain No. 13CA010454, 2014-Ohio-552, ¶ 9 ("Because the '12 of 22' finding was sufficient to support the first prong of the permanent custody test, any error in the trial court's alternate finding under R.C. 2151.414(E) would not constitute reversible error because it did not result in any prejudice * * *."), citing *In re R.H.*, 9th Dist. Lorain Nos. 11CA010002 and 11CA010003, 2011-Ohio-6749, ¶ 14; *In re Franklin*, 3d Dist. Marion Nos. 9-06-12 and 9-06-13, 2006-Ohio-4841, ¶ 14-16.

{¶23} Moreover, to the extent that Johnson argues in her second assignment of error that the grant of permanent custody was improper because CPSU failed to demonstrate that it used "reasonable efforts" as required by other sections of R.C. Chapter 2151, Johnson's argument is misplaced. "[V]arious sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit," most notably R.C. 2151.419. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, ¶ 29. Under R.C. 2151.419, when a trial court

> removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate

the continued removal of the child from the child's home, or to make

it possible for the child to return safely home.

R.C. 2151.419(A)(1). R.C. 2151.419(A)(1) applies only at "'adjudicatory, emergency, detention, and temporary disposition hearings, and dispositional hearings for abused, neglected, or dependent children * * *.'" *In re N.R.S.*, 2018-Ohio-125, at ¶ 25, quoting *In re C.F.* at ¶ 41. R.C. 2151.419(A)(1) "makes no reference to a hearing on a motion for permanent custody. Therefore, '[b]y its plain terms, the statute does not apply to motions for permanent custody brought pursuant to R.C. 2151.413, or to hearings held on such motions pursuant to R.C. 2151.414.'" *In re C.F.* at ¶ 41, quoting *In re A.C.*, 12th Dist. Clermont No. CA2004-05-041, 2004-Ohio-5531, ¶ 30. However, this does not relieve children services agencies of the duty to use reasonable efforts. *Id.* at ¶ 42. "If [an] agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *Id.* at ¶ 43.

{¶24} In this case, the trial court made reasonable-efforts findings on three occasions prior to the permanent-custody hearing: at the hearing before CPSU was granted emergency temporary custody of L.L., at the dispositional hearing, and in a March 29, 2019 judgment entry specially finding that CPSU used reasonable efforts. (Doc. Nos. 11, 20, 79). Johnson does not argue that the trial court's previous reasonable-efforts findings are unsupported by the record. (*See generally*

Appellant's Brief at 16-19). In sum, because the trial court previously made reasonable-efforts findings, CPSU was not required to prove, nor was the trial court required to find, that CPSU used reasonable efforts to reunify Johnson with L.L. before the trial court could grant permanent custody of L.L. to CPSU. *In re T.A.M.*, 3d Dist. Crawford No. 3-18-13, 2018-Ohio-5058, ¶ 16.

{¶25} Finally, we address Johnson's first assignment of error. In her first assignment of error, Johnson argues that clear and convincing evidence does not support the trial court's determinations under R.C. 2151.414(B)(1)(a) and (b) or its determination that granting permanent custody of L.L. to CPSU is in L.L.'s best interest. (Appellant's Brief at 8-16). Under Johnson's third assignment of error, we concluded that clear and convincing evidence supports the trial court's determination under R.C. 2151.414(B)(1)(b) that L.L. is abandoned. Furthermore, as explained under Johnson's second assignment of error, we do not need to examine whether the trial court's R.C. 2151.414(B)(1)(a) determination is supported by the record. As a result, we consider only whether the trial court's best-interest findings are supported by clear and convincing evidence.

{¶26} With respect to L.L.'s best interest, the trial court found:

The Court has considered the interaction and interrelationship of [L.L.] with [L.L.'s] parents, siblings, relatives and foster caregivers. [L.L.] has been in the same foster home since she was released from

the hospital after birth. [L.L.] has an established relationship with her sister, C.W., due to the efforts of the foster mother in continuing visits with the family that is raising C.W. [L.L.] has no established relationship with [Johnson] * * * due to the lack of visits attended by [Johnson] * * * over the past many months. Karmen Lauth [("Lauth")] testified that [L.L.] is in need of a legally secure and permanent placement which cannot be achieved unless permanent custody is granted. Also, * * * the Court has considered that the factors outlined in R.C. 2151.414(E)(10) and (11) exist in this case. Accordingly, the Court finds by clear and convincing evidence that it is in [L.L.'s] best interest to grant CPSU's motion for permanent custody.

(Doc. No. 89).

{¶27} After reviewing the record, we conclude that clear and convincing evidence supports the trial court's determination that it is in the best interest of L.L. to grant permanent custody of L.L. to CPSU. First, it is clear that, pursuant to R.C. 2151.414(D)(1)(a), the trial court considered L.L.'s interaction and interrelationship with her relatives and foster caregivers, and the record supports the trial court's findings under R.C. 2151.414(D)(1)(a). At the permanent custody hearing, Lauth testified that L.L. has been placed with the same foster mother since she was initially

removed from Johnson's custody. (Aug. 16, 2019 Tr. at 64). Lauth stated that L.L. "knows no other parent than her foster parent" and that L.L. is "quite bonded" with her foster mother. (*Id.*). Moreover, the record supports that L.L.'s foster mother has attempted to facilitate relationships with L.L.'s siblings and other family members. Lauth testified that L.L.'s foster mother "has facilitated a family relationship" with L.L.'s paternal relatives and that L.L. "sees one of her half siblings when she visits with her paternal grandmother." (*Id.* at 60). According to Lauth, L.L. sees her paternal grandmother "fairly regularly." (*Id.* at 61). Lauth also stated that L.L.'s foster mother had "reached out to the other half sibling who was recently adopted and would like to facilitate a sibling relationship with that child as well."[5] (*Id.* at 61).

{¶28} In addition, the record establishes that Johnson does not have a strong relationship with L.L. While the testimony showed that Johnson's few visitations with L.L. were "appropriate," Lauth remarked that L.L. "does not know [Johnson] as her mother." (*Id.* at 18-19, 60, 182). She stated that Johnson made "[v]ery little" progress in developing a relationship and forming a bond with L.L. (*Id.* at 53-54). Therefore, the trial court's findings about L.L.'s interaction and interrelationship

---

[5] Lauth is likely referring to Johnson's other child, C.W., in this statement. The record reflects that Lanning is not the father of C.W. (*See* Doc. No. 1). As a result, it is likely that Lauth was not referring to C.W. when she testified to L.L.'s established relationship with her paternal half-sibling. Although the trial court might have mistakenly found that L.L. has an established relationship with C.W., the record still supports that L.L. has a longstanding relationship with one of her siblings and that L.L.'s foster mother is making an effort to establish a relationship with L.L.'s other sibling.

with her relatives and foster caregivers are supported by the record, and this factor clearly weighs in favor of granting permanent custody to CPSU. *See In re C.J.P.*, 10th Dist. Franklin No. 08AP-665, 2009-Ohio-1552, ¶ 10-13; *In re Adams*, 3d Dist. Seneca No. 13-04-27, 2004-Ohio-7039, ¶ 19.

{¶29} Although the trial court did not make any specific findings under R.C. 2151.414(D)(1)(b), which obligates the trial court to consider the wishes of the child, this does not call the trial court's permanent-custody determination into question. At the time of the permanent custody hearing, L.L. was not yet 19 months old, and as confirmed by the GAL in her report, "[d]ue to [L.L.'s] age, she [was] unable to voice her wishes." (Doc. No. 84). In her report, the GAL recommended that CPSU be awarded permanent custody of L.L. (*Id.*). From the trial court's judgment entry, it is clear both that the trial court was aware of the GAL's report and that the trial court considered the relevancy of R.C. 2151.414(D)(1)(b). (*See* Doc. No. 89). Thus, under the circumstances of this case, we are satisfied that the trial court adequately considered L.L.'s wishes as expressed through L.L.'s GAL, and this factor supports the grant of permanent custody. *See In re N.S.N.*, 4th Dist. Washington Nos. 15CA6, 15CA7, 15CA8 and 15CA9, 2015-Ohio-2486, ¶ 38-40 (finding no error where trial court stated that it had considered "'all relevant evidence and factors,'" but omitted a specific discussion of R.C. 2151.414(D)(1)(b), because it appeared that the trial court "considered R.C. 2151.414(D)(1)(b) but

determined that the children were too young or immature to directly express their wishes"); *In re Haller*, 3d Dist. Wyandot No. 16-08-16, 2009-Ohio-545, ¶ 17 (noting that a child's wishes may be ascertained from the GAL's report and recommendation, especially where the child is "of tender years" or developmentally delayed).

**{¶30}** Regarding R.C. 2151.414(D)(1)(c), which requires the trial court to consider the child's custodial history, we believe that the trial court properly considered L.L.'s custodial history. In its conclusion, the trial court stated that its best-interest determination was made in consideration of "the relevant factors herein, including those as set forth in R.C. 2151.414(D)(1)(a)-(e) * * *." (Doc. No. 89). This statement "indicates that the court was aware of and considered all of the factors outlined in R.C. 2151.414(D)(1)," including L.L.'s custodial history. *In re N.S.N.* at ¶ 38. In addition, the trial court's finding that L.L. "has been in the same foster home since she was released from the hospital after birth" appears to reflect the trial court's consideration of L.L.'s custodial history. (Doc. No. 89). The record clearly and convincingly establishes that L.L. has been in the custody of CPSU for nearly her entire life. L.L. was placed in the emergency temporary custody of CPSU only days after her birth and has remained in the custody of CPSU ever since. When CPSU filed its motion for permanent custody, L.L. had been in the temporary custody of CPSU for nearly a year, and by the time of the permanent custody

hearing, L.L. had been in CPSU's custody for well over a year and a half. The fact that L.L. has been in CPSU's temporary custody for most of her short life supports the grant of permanent custody to CPSU. *See In re R.S.*, 4th Dist. Highland No. 13CA22, 2013-Ohio-5569, ¶ 44, 47 (holding that the trial court's grant of permanent custody was supported by the fact that the child "has spent his entire life in [the agency's] temporary custody," "remained in the same foster home throughout that time," and "has not spent a single day in appellant's custody").

{¶31} Next, we consider whether the trial court's findings under R.C. 2151.414(D)(1)(d), which requires the trial court to consider the child's need for a legally secure permanent placement and whether that type of placement can be achieved without granting permanent custody, are supported by clear and convincing evidence. At the permanent custody hearing, Lauth detailed the efforts CPSU used to determine whether L.L. could be placed with a family friend or one of her relatives. According to Lauth, CPSU conducted "three home studies to explore relatives and kin." (Aug. 16, 2019 Tr. at 62). However, all possible kinship placements were ruled out after study and vetting. (*Id.* at 63-64). In addition, L.L.'s paternal grandmother, with whom L.L. has a relationship, insisted that she did not want custody of L.L. and would prefer to maintain a grandparent-grandchild relationship. (*Id.* at 61).

{¶32} Additionally, CPSU presented evidence that Johnson would not be capable of providing L.L. with a legally secure permanent placement in the foreseeable future, and Johnson did little to rebut CPSU's evidence. First, CPSU presented evidence that raised the possibility that Johnson's problems with substance abuse might still impair her ability to provide a stable home environment for L.L. Johnson acknowledged that after being released from jail, she tested positive for cocaine. (*Id.* at 112). She maintained that she only used cocaine because she mistakenly believed that she needed to test positive for drugs in order to be admitted into a particular rehabilitation center. (*Id.* at 139). However, CPSU provided evidence demonstrating that Johnson did not need to be an active user of drugs to be admitted into the facility, and Johnson conceded that she did not call the facility in advance to inquire about their admissions criteria. (*Id.* at 162, 177). In addition, Lauth testified that Johnson tested positive for THC just days before the permanent custody hearing. (*Id.* at 52, 59). Although Johnson presented evidence that two subsequent drug screens, one conducted a day after Johnson tested positive and one conducted the day of the permanent custody hearing, came back negative for THC, the positive drug screen nevertheless raises the concern that Johnson is still using drugs.

{¶33} CPSU also presented evidence that Johnson would likely be unable to provide L.L. with safe, stable housing. Lauth testified that, to her knowledge,

Johnson has never been able to establish safe and stable housing as an adult. (*Id.* at 98). Both Lauth and Johnson testified that, as of the date of the permanent custody hearing, Johnson was living with Johnson's mother. (*Id.* at 53, 60, 109-110). Lauth testified that CPSU believed that it was not appropriate for L.L. to live with Johnson's mother due to Johnson's mother's extensive history of drug abuse, though Johnson testified that her mother had been clean for some time in 2019. (*Id.* at 53, 60, 110-111). Lauth further testified that there were safer housing options available for Johnson at City Mission and that children under CPSU's supervision had previously lived with their parents at City Mission, but that Johnson had not taken advantage of that opportunity. (*Id.* at 102-103). Johnson testified that she was offered "sober living" after being discharged from the rehabilitation center, but that she declined that offer. (*Id.* at 112-113). However, Johnson testified that she intended to submit an application to a new independent sober living development, but she acknowledged that the application had not yet been completed. (*Id.* at 149-150). In addition, there was no evidence presented that Johnson would have been capable of providing for L.L. financially within a reasonable time. Johnson testified that, at the time of the permanent custody hearing, she was not employed, but she stated that she desired to work. (*Id.* at 121-122). She stated that she was filling out job applications and that she was considering applying for social security benefits due to her heart condition. (*Id.* at 121-122).

**{¶34}** Lastly, Lauth testified directly to L.L.'s need for a legally secure permanent placement and offered her opinion regarding whether that type of placement could be achieved without a grant of permanent custody to CPSU. Lauth testified that L.L. had "been in the foster home during the entirety of the case and she needs a permanent home in which to grow." (Aug. 16, 2019 Tr. at 35). Lauth testified that L.L. is in need of a legally secure permanent placement and that she did not believe that that placement could be accomplished without permanent custody being granted. (*Id.* at 62-63). Lauth further stated that she believed that permanent custody was the "least restrictive" means of providing L.L. with stability, that L.L. needed a "permanent, safe, [and] loving home in which to grow," and that, ultimately, adoption by the foster parent would "greatly benefit" L.L. (*Id.* at 65-66). Thus, we conclude that the record supports the trial court's determination under R.C. 2151.414(D)(1)(d) that L.L. is in need of a legally secure permanent placement and that this type of placement cannot be accomplished without granting permanent custody of L.L. to CPSU.

**{¶35}** Finally, the record supports the trial court's finding that two of the factors in R.C. 2151.414(E)(7) to (11), R.C. 2151.414(E)(10) and (11), apply in relation to Johnson and L.L. *See* R.C. 2151.414(D)(1)(e). We first consider R.C. 2151.414(E)(10). R.C. 2151.414(E)(10) asks the trial court to consider whether the parent has abandoned the child. As explained under Johnson's third assignment of

-27-

error, there is clear and convincing evidence supporting the trial court's determination under R.C. 2151.414(B)(1)(b) that L.L. is abandoned. Accordingly, the record also supports the trial court's determination under R.C. 2151.414(E)(10) that Johnson abandoned L.L.

{¶36} Moreover, there is clear and convincing evidence supporting the trial court's determination that R.C. 2151.414(E)(11) applies. Under R.C. 2151.414(E)(11), the trial court should consider whether "[t]he parent has had parental rights involuntarily terminated with respect to a sibling of the child" and whether "the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child." At the permanent custody hearing, the trial court heard evidence that Johnson's parental rights to her other biological daughter, C.W., were terminated less than two weeks before L.L.'s birth. (Aug. 16, 2019 Tr. at 35-36, 123-124); (CPSU's Ex. 3). Furthermore, as discussed in our examination of the trial court's findings under R.C. 2151.414(D)(1)(d), Johnson failed to prove that she could provide a legally secure permanent placement for L.L. As a result, the record supports the trial court's determination concerning the applicability of R.C. 2151.414(E)(11).

{¶37} In light of the foregoing, we conclude that clear and convincing evidence supports the trial court's determination under R.C. 2151.414(B)(1)(b) that L.L. is abandoned. We also conclude that clear and convincing evidence supports the trial court's determination that granting permanent custody of L.L. to CPSU is in L.L.'s best interest. Therefore, we conclude that the trial court did not err by granting permanent custody of L.L. to CPSU.

{¶38} Johnson's first, second, and third assignments of error are overruled.

{¶39} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**SHAW, P.J., concurs.**

**/jlr**

**WILLAMOWSKI, J., concurring separately.**

{¶40} I am writing separately because although I concur with the conclusion of the majority, I fully agree with the reasoning of the majority except as to part of the third assignment of error upholding the finding that the child was abandoned. The record is clear that for a portion of the time that Johnson did not have contact with the child, she was in a hospital for treatment. Although the trial court found that the hospitalization was due to Johnson's voluntary drug usage, I would not

count that time against Johnson. I do not want to set a precedent that time being treated for an illness, regardless of what caused the illness, should be counted as part of an abandonment calculation. Public policy would encourage one, especially a parent, to seek whatever medical treatment they require without concern that it would be used against them in a court proceeding to terminate parental rights. The finding regarding seeking medical treatment was unnecessary to the trial court's final determination that the child was abandoned. The trial court also had a period of time where there was no contact for over 90 days while Johnson was in jail. The failure to maintain contact while in jail was a voluntary choice. Since that time lasted more than 90 days, I agree with the majority that the evidence supports the trial court's finding that Johnson had abandoned her child by failing to maintain contact for more than a period of 90 days. For this reason, I am concurring separately in the judgment.